**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO: 2:22-cr-201(2)** |
| | : | |
| v. | : | **JUDGE EDMUND A. SARGUS** |
| | : | |
| **WILLIAM STANSBERRY JR.,** | : | |

**SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD DEPARTURE AND VARIANCE DOWNWARD TO THE ADVISORY GUIDELINES OF DEFENSE COUNSEL ON BEHALF OF WILLIAM STANSBERRY JR.**

*Introduction*

William Stansberry Jr. is forty-seven and a half (47½) years old, and was born in Chillicothe, Ohio. His father, William Stansberry Sr., is seventy-one (71) years old, and resides in Chillicothe, Ohio. William's mother, Connie Minney, died in a car accident when William was only twelve (12) years old. William's father is a retired law-enforcement officer, and his mother was a nurse prior to her death. William has one biological sister, Stacy Coffee, who also resides in Chillicothe, Ohio where she works as a pharmacist. In addition, William has two (2) paternal half siblings. Both siblings also live in the Chillicothe area and one is a teacher, and the other is disabled.

William's childhood was dysfunctional at best. His parents divorced when he was an infant and his mother re-married his stepfather, Harvey Minney. William remembers living with his mother as a child until she passed away. Her death was a huge blow to the family dynamics. William had a very difficult time accepting his mother's death and as such, he received some counseling. Unfortunately, his time in counseling only lasted two (2) sessions. After his mother's passing, William began misbehaving in school and got involved in fights because of his

unresolved emotions, which is why he started counseling. Furthermore, William did not have a relationship with his stepfather, who stopped caring for William and his sister after their mother died. Subsequently, William and his sister moved in with their father and stepmother, Janet Stansberry. Janet recently passed from Alzheimer's disease. As a young boy, William had no relationship with his stepmother, but tried to mend that relationship prior to her passing.

Moving in with his father was not the best choice for William. Prior to moving in, William had a bad relationship with his father and the relationship only worsened once he moved in. His father physically abused him daily and continued to use William as his own personal "punching bag" until he was eighteen (18) years old. The continuous physical and mental abuse caused William to start drinking at the age of fourteen (14) with the hopes of being kicked out of his home. The relationship remained in a terrible state from the time William was eighteen (18) until the year 2000. As such, William would not let his father see his granddaughter, Aubrey, unless he changed how he acted. Conversely, William's father changed his behavior and made amends, to which the parties now have a much closer relationship. Unfortunately, William's father was recently diagnosed with prostate cancer, and was given less than a year to live. William now helps care for his father's property, as well as his father's medical needs.

William has four (4) children. The oldest is Aubrey Stansberry, who resides in Chillicothe and is employed as a pharmacy technician. Aubrey's mother is Diana Parrot, whom William never married. In 2002, William married Jacqueline Redman, but the couple divorced in 2008. Together they share one child, Jackson Stansberry. Jackson works for the family company, and they see each other several times a week. William has another son named Beau McGarvey who is ten (10) years old. Beau resides with his mother, Terry McGarvey. William does not have a

relationship with Beau, and despite his desire to have one, Beau's mother will not allow it. Currently, William pays five hundred and thirty dollars ($530) a month in child support for Beau.

William is currently married to Cristina Stansberry. The couple married on June 5, 2010, and have known each other for most of their lives. They share one child together, Chloe Stansberry, who is eleven (11) years old. Chloe is involved with the 4H Club, basketball, and band. When he is not working, William spends time with his family, or he is attending one of his daughter's extracurricular activities.

William's wife, Cristina, works for MJM Logistics. Although she is full-time there, Cristina will not be able to provide for her family on her income alone. If William were to be incarcerated, Cristina would be forced to move her family into the home of William's father, who has less than a year to live. Cristina shared with the Probation Officer that her husband is the rock of the family and her best friend. She recalled witnessing her husband's reaction when he came home the morning of the incident. She conveyed that after the morning of the incident, her husband started to consume alcohol daily. Through all her efforts, she cannot get William to stop worrying about the well-being of their family, should he be sentenced to prison. Moreover, Cristina is concerned about the effect incarceration would have on the relationship between William and his daughter. Cristina acknowledges that her husband needs counseling to unpack his childhood trauma, as well as the stress from the instant offense.

### *Education*

William graduated from Huntington Local High School in Chillicothe, Ohio, in 1995. While there, William was an average student, and he was an active member on the basketball and football teams. Regarding special skills, William entered the Police Academy at Ohio University in Athens, Ohio. He completed that certified program in 2009.

*<u>Employment</u>*

Since high school, William has worked hard at everything he has done employment wise. He has been employed in restaurants, a logging company, and at Terminix where he started in 1995. William worked with Terminix until 2002, to which he learned the pest control business in those seven years. In 2002, William changed occupation and began working at Herr's Potato Chips until 2009 when he left to pursue a law enforcement career. William entered the police academy and was subsequently employed by the Chillicothe Police Department as a Police Officer from 2009 to 2014. In 2015, William was employed by the Pike County Sherriff's Office where he was a Sergeant assigned to road patrol until his resignation in 2020.

It is important to note that the entire time he was a law enforcement officer, William also ran a part-time family business, Convenient Termite and Pest Control, which he had owned since 2006. The business was a part-time job while William was employed as a law enforcement officer, however, since his resignation in 2020, William has had to make it a full-time job.

*<u>Physical and Mental Health</u>*

Physically, William is a healthy forty-seven (47) year old male. Unfortunately, the same cannot be said regarding his mental and emotional health. Williams has not had any counseling since he was twelve (12) years old. He needs intensive counseling to deal with the trauma that he carries from his childhood and teenage years. William does not know how to process and handle the stressors in his life. However, William is very open to all types of counseling that will help him provide a safe environment for himself, his family, and the people around him.

*<u>Support from Friends and Family</u>*

William's inaction in this case, has started to give him insight that he needs to seek help from his family, and friends. He needs their advice and their support. Counsel has attached letters from

4

former coworkers and friends outlining individuals who will be there to help William. This concept is new to William and he is overwhelmed by the support in his community.

### *Substance Abuse*

Between the ages of eighteen (18) and twenty-two (22), William experimented with some drugs. During that time, he smoked marijuana on a fairly regular basis, however, William has not smoked in the past nineteen (19) years. He also indicated that he started drinking alcohol at the age of fourteen (14) to try to cope with the abuse form his father and the death of his mother. In a social setting, William would usually drink approximately six (6) beers to help get his mind off of things. Unfortunately, that amount has since increased. According to both William and his wife, he needs and wants alcohol counseling. William is aware of and understands the connection between his mental health problems and his use of alcohol.

### *Guideline Calculations*

All parties are aware that the guidelines are advisory. This is the type of case that warrants both a downward departure and a variation downward. In cases involving the use of force by law enforcement, the defendant is punished for his occupation. In said occupation, the defendant is both lawfully permitted to use reasonable force and trained on the use of force, which centers around the use of force continuum.

Counsel is specifically referencing the four (4) point enhancement in Paragraph 31, the three (3) point enhancement in Paragraph 33, and the two (2) point enhancement in Paragraph 38.

In order to provide the Court with context behind Counsel's argument, if there were a Hobbs Act robbery in progress and the defendant tied the victim to a chair and then maced the victim, those enhancements would be correctly applied. That situation is markedly different than

5

the case at bar. Here, the defendant is a law enforcement officer who has tactics, devices, and compliance measures available to him and required by policy as he is cloaked with that authority. This defendant chose neither to restrain the victim, nor deploy the mace. The use of a restraint chair and the use of mace should not serve as an automatic trigger to the enhancements. The analysis is whether the use of those devices was excessive based on training.

The conduct that Mr. Stansberry is being sentenced for is his failure to intervene with a deployment of mace to a victim already in a restraint chair. It is important for the Court to understand that this conduct occurred in 2019. Of like importance, the Department of Justice had not updated its use of force policy until 2022, from its last update in 2004.[1] The new policy, effective well after the offense conduct, requires officers to stop others' excessive force.[2] It was not until 2022 that the Department of Justice imposed this affirmative duty in its own policies and procedures. The enhancements in the sentencing guidelines did not contemplate a defendant pleading guilty to inaction. Rather, the guideline enhancements contemplate the act of restraint and the act of mace, neither of which was done by this defendant.

Similarly, when an officer uses deadly force on duty and is subsequently charged with murder in a state case, he or she is not charged with a gun specification. This is because officers are lawfully allowed and are required to carry their weapon in the course of their employment. The pulling of the trigger is not the issue in that case. Rather, the issue is whether the pulling of the trigger was justified.

This case is unique and does not fit into the "one-size-fits-all" approach that the sentencing guidelines model. For that reason, Defense Counsel urges the Court to vary downward from the highly punitive range outlined by Probation and the Government.

---

[1] https://eji.org/news/new-doj-policy-requires-officers-to-stop-others-excessive-force/;
https://www.npr.org/2022/05/24/1100920286/doj-new-policy-excessive-force
[2] *Id.*

The juxtaposition of mace in the sentencing guidelines and the use of mace in law enforcement statewide training demonstrates the need for reconciliation. Law enforcement officers are trained to use mace **before** reaching for their deadly weapon. Law enforcement officers are not trained that mace is a dangerous ordnance. Otherwise, any student on Ohio State University carrying mace in their coat pockets while walking on campus late at night and stopped by police would be charged with carrying a concealed weapon. That is not the case. The defendant never formed the requisite intent to use mace as a dangerous ordnance as their training tells law enforcement the opposite: that mace is not a dangerous ordnance.

Through such definitions and case law, the Federal Probation Officer and the Government find ways to call pepper spray a "dangerous weapon." Nevertheless, every day in Ohio law enforcement officers are taught that pepper spray is not a dangerous weapon which is why it is on the low end of the use of force continuum. Depending on whether an officer is working in a jail or on patrol, they are required to carry mace just as they are a gun. It is irrational to punish an on-duty law enforcement officer that plead guilty to a violation of civil rights due to excessive use of mace, and thereafter punish him for the mace canister itself.

In response to the defense objections, the Government indicates that William was technically a "supervisor" as he was a Sergeant at the Pike County Sheriff's Department. However, it is imperative that the Court understands that William was a Sergeant of the *road patrol*. William Stansberry has never worked in a jail, nor has he ever been trained to work in a jail. In the Pike County Sheriff's Department, there are two distinct divisions: those deputies who work in the jail, and those who work on patrol.

When William was called to the jail, the victim was already in in the restraint chair and already looked as though he had been maced. William had no control over this first situation, as

7

he was called to the jail thereafter Mooney's first deployment of mace ever even occurred. William knew the victim and asked him what he needed. The victim asked for some fresh air, to which William then asked Co-Defendant Mooney if they were allowed to take the victim outside to get some fresh air because he did not know whether that was allowed. Mr. Mooney worked in the jail. He was trained to work in the jail. Mr. Mooney indicated that it was permissible to take the victim outside while in the restraint chair. William did not have the authority to tell someone working in the jail what to do. He does not know the procedures, the policies, or the training that goes into that part of the Sheriff's Department.

The defense's second objection is centered on the victim sustaining bodily injury and the three-point enhancement that follows. The victim here would have sustained an injury that was painful and obvious without William failing to intervene, as Mooney deployed mace on two separate occasions, without William even present in the first situation. He could not have prevented the first situation from happening, and the victim would have sustained the injury regardless. William admits that he should have stopped Mr. Mooney from deploying mace the second time outside.

These facts do not serve as an excuse or a defense for William, rather they are offered to give the Court a complete picture of the dynamics between the employees at the Pike County Sheriff's Department.

The defense's third objection lies in the two-level enhancement the probation department attributes and the government agrees to in paragraph 38. In the cases interpreting the guidelines the government relies on, there is an important distinction: every officer in all of the cases cited physically assists with the restraint, which serves as the catalyst or prerequisite for the assault that eventually ensues on the victim. All of the officers involved take part in the restraint. None

of the officers who were charged in any of those cases were charged with the conduct of failing to intervene. In fact, in *United States v. Gray*, Officer Mangold *tells* Officer Gray to stop restraining the victim, but Officer Gray ignores Mangold's plea and instead orders other officers to leave to which they comply.[3] None of those other officers were charged under a theory of failing to intervene and given a two level enhancement for a co-defendant having restrained the victim.

### *Request for Downward Departure*

The Defense contends that William should be granted a downward departure pursuant to U.S.S.G §5K2.20 which states, "a sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior." Application note 1 defines "aberrant behavior," as a single criminal occurrence or transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life."[4]

William meets all three criteria for this departure. William engaged in no type of planning with Mooney. When William failed to intervene with Mooney's deployment of mace, it only lasted seconds in duration. Finally, William has lived a law-abiding life until this case.

### *Sentencing Memorandum*

The undersigned Counsel has no doubt that this Court is well aware that under the decision of the United States Supreme Court in the case of *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are no longer binding on the Court. Instead, the Court is required to fashion a sentence without the context of 18 U.S.C. §3553(a) and impose a sentence which is sufficient but no greater than necessary to achieve the four purposes of sentencing set

---

[3] *United States v. Gray*, 692 F.3d 514, 517 (2012).
[4] U.S.S.G. §5K2.20

9

forth in §3553(a)(2). In imposing a sentence, the Court must consider all of the factors set forth in §3553(a)(1-7). As the honorable Court is aware 18 U.S.C §3553 (a) reads as follows:

> "(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set froth in paragraph (2) of this subsection. The court, in determining the *particular* sentence to be imposed, shall consider –
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed;
>
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct;
>
>     (C) to protect the public from further crimes of the defendant; and
>
>     (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner," (Emphasis added.)
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
> (5) any pertinent policy statement –
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

The purpose of the Sentencing Memorandum is not to minimize, excuse, or alter William's involvement in this case, or his acknowledgement and acceptance of his responsibility. Rather, it is to provide context and to assist this Honorable Court in fashioning a sentence it

deems appropriate. Counsel has already gone over the history and characteristics as they relate to William, and they are also laid out in the Presentence Report.

*Nature and Circumstances of the Offense*

The basic offense conduct is laid out by the probation officer in paragraphs 11 through 19 of the final presentence report. Although defense counsel agrees with concepts in those paragraphs, there are specifics that are simply incorrect and don't apply to use the force cases. Counsel has addressed the issue of a supervisory role, and William's lack of training and capabilities for the jail as opposed to patrol.

In paragraph 12, the probation officer indicated that a Pike County policy states that, 'no further use of force can be applied to any inmate secured in the restraint chair." While Defense Counsel does not disagree that a policy to that effect exists, Defense Counsel knows, based on experience, that those polices are still subject to the constitution and laws of the United States of America surrounding police use of force. The constitutionality of police use of force is derived from two cases: *Tennesse v. Garner*[5] and *Graham v. Connor*[6].

Defense Counsel has tried a civil rights violation case in the Southern District of Ohio where jailers out of Ironton had a similar policy, but had to use force on a victim in a restraint chair, which the constitution permitted and the jury found the force to be reasonable and the Defendant to be justified.[7]

Paragraph 13 alleges that William witnessed an incident with a large canister of OC spray. However, William was nowhere around involving the incident with said canister. Thereafter,

---

[5] *Tennessee v. Garner*, 471 U.S. 1 (1985).
[6] *Graham v. Connor*, 490 U.S. 386 (1989).
[7] *United States v. Hanshaw*, 1:14-cr-120

11

William gets involved. Once he made entry into the room, he asked Mr. Friend if he needed anything. Mr. Friend requested fresh air, and due to Williams ignorance and lack of training in the jail, William asked Mr. Mooney if allowing Mr. Friend some fresh air was permissible. Once Mr. Friend was outside, Mooney went back in and grabbed a small canister of pepper spray unbeknownst to Stansberry.

Paragraph 15 speaks to Mr. Stansberry's inaction after Mooney deploys mace. Mr. Stansberry had to wait for the fog to dissipate before approaching Mr. Friend as a matter of safety.

The Final Pre-Sentence Investigation report is completely devoid of the actions that Mr. Stansberry *did* take after Mooney deployed the mace. My client asked if everyone was OK before leaving the room. He had to get to the radio room to call the elected sheriff and call for his own supervisor immediately. He reported what happened and acted in accordance with his training. He did not ignore the situation at hand, and in no way, shape, or form did he know that Mooney would physically assault Mr. Friend as Stansberry was notifying his chain of command.

William has voluntarily surrendered his OPOTA certificate, resigned from the Pike county sheriff's department, and walked away from a career that he loved for so long. This is no small amount of punishment in and of itself. William is embarrassed by his inaction, and the fact that he tarnished the badge that he wore that he received when he swore to uphold to his fellow brother and in the citizens of Pike County. He was trusted to uphold the law, and he violated that trust.

## *Need for Sentence Imposed*

Defense Counsel understands that the Court must fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. We are before this Court because the type of force used by Mr. Mooney was excessive, and William

12

failed to intervene after he was outside. This Court is well versed in the facts surrounding this case as it presided over the Co-Defendant's trial where it heard William's testimony as to the truth and veracity that he displayed. Furthermore, this Court witnessed the emotional effect William's failure to intervene had on him.

Defense Counsel submits that a sentence requiring William to serve 100 days of home confinement monitoring, as a condition of five (5) years on probation, would reflect the seriousness of the offense, provide just punishment, and protect the public. This sentence is consistent with Congress's mandate as laid out by the Sentencing Commission and Congressional Directives.

The above proposed punishment would put in place severe restrictions on William and would limit his liberty and freedom. Restrictions will include travel, by requiring William to ask permission to travel, receive permission to change jobs, and receive permission to change his residence. There are also collateral consequences of a felony conviction that will haunt William for the rest of his life. His reputation and career have been ruined within law enforcement and the community.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court addressed the Eight Circuit Court of Appeals' reversal of a district Court's sentencing variance from 30-37 months to three years of probation. The district Court judge stressed at Gall's sentencing hearing that, "probation rather than 'an act of leniency' is a 'substantial restriction of freedom." *Id*. at 44 (internal citations omitted). The Supreme Court agreed, noting that:

> [w]e recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587,151

13

> L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffen v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3 Most probationers are also subject to individual "special conditions" imposed by the Court.

*Gall*, 522 U.S. at 48.

### ***Seriousness of Offense/Deterrence***

If this Court were to impose a below the guidelines sentence of probation, the seriousness of William's actions would not be diminished, and others would be deterred from repeating his actions. William voluntarily took himself out of law enforcement. Never again will he be faced with the decision of whether to intervene when someone is using excessive force. William feels terrible for not intervening, and in his heart, he knows that he should have, which he stated in his first interview. As a result of this incident, William will never have the opportunity to wear a badge again, nor will he have the ability to be in law enforcement again. This lost ability is indicative of specific deterrence.

William has no prior criminal history as a civilian and the charge before this Court stems from the decisions William made while on duty that evening. Failing to intervene haunts William daily, and the insight he has gained from his inactions, make it clear that specific deterrence has been achieved.

By pleading guilty, William has tarnished the badge and reputation of all law enforcement. He understands that his inactions have perpetuated and contributed to the negative police attitudes that currently sweep across the country. The guilty plea, coupled with the

14

publicity that will follow, serve as general deterrence. A sentence variation below the guidelines will still put others in the law enforcement community on notice that similar actions and inactions by law-enforcement officers will not be tolerated and will be punished. A sentence below the guidelines that is highly restrictive on movement and strict on compliance with probation will deter others from making similar decisions. Moreover, Defense Counsel has represented police officers for twenty-eight (28) years. Counsel believes cases like this have a rippling effect throughout the law enforcement community, and that this case will hopefully have a positive effect on the general deterrence of excessive force or lack of intervening.

### *Need to Protect the Public from Further Crimes*

The nature of William's criminal conduct that evening dramatically conflicts with his record of being a law-abiding citizen his entire life. His actions involve a moment in time where he froze and failed to protect and serve others, as he was sworn to do. The Final Presentence Report reveals a life dedicated to hard work, providing for his children, and loving his family and friends.

Based on William's demographics, he presents a very low risk of recidivating. The risk is even more so decreased by stripping him of his law enforcement certifications. As this Honorable Court is aware, the Sentencing Commission found that younger offenders are more likely to be arrested than older offenders. William presents a statistically lower chance of reoffending and thus, presents no threat to society in the future.

### *Provide the Defendant with Needed Education or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.*

Obtaining counseling for both mental health and alcohol addiction would be extremely beneficial to William. This two-way approach would help William implement strategies and mechanisms to prevent him from falling down the slippery slope he started after this incident.

15

There is a lot of "unpacking" that needs to be done regarding William's childhood and teenage years. William needs to assess and understand why he did nothing that evening. There is a reason he froze and that is what needs to be unearthed.

### *Conclusion*

William has demonstrated to this Honorable Court, to the victim, to society, and to his family and friends that he is deserving and worthy of a probationary sentence. He has acknowledged his wrongdoing, and he has tried to do his best in accepting responsibility and telling the truth about what happened that evening. William has voluntarily relinquished the privilege to serve our community as a police officer, a career that he dedicated most of his life.

It has been demonstrated to this Court that the sentence requested by Counsel would not demean the seriousness of the offense, and it would accomplish the principles and purposes of sentencing as it would serve as both specific and general deterrence for future crime. As such, Defense Counsel respectfully requests a sentence of Probation with some type of home monitoring, along with five (5) years of Probation.

Respectfully submitted,

/s/ *Mark C. Collins*
**MARK C. COLLINS (0061207)**
**KAITLYN C. STEPHENS (0095589)**
COLLINS & STEPHENS CO. LPA
150 E. Mound St., Suite 308
Columbus, Ohio  43215
(614) 443-3100    (614) 413-3902 – Fax
mark@mcollinslaw.com
kaitlyn@mcollinslaw.com
*Attorney for Defendant William Stansberry Jr.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I electronically filed the Sentencing Memorandum and Adjustments to the Advisory Guidelines with the Clerk of Courts using the CM/ECF System, which will send notifications of such filing to the following: **Peter K. Glenn-Applegate, Esq., and Cameron A. Bell, Esq.**

/s/*Mark C. Collins*
**MARK C. COLLINS (0061207)**